## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

MALLORY RUH                                                  CIVIL ACTION

VERSUS                                                        15-439-SDD-RLB

SUPERIOR HOME HEALTH CARE, INC.

## RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] by Defendant, Superior Home Health Care, Inc. ("Superior" or "Defendant"). Plaintiff, Mallory Ruh ("Plaintiff") has filed an *Opposition*[2] to this motion, to which Defendant filed a *Reply.*[3] For the following reasons, the Court finds that Defendant's motion should be granted in part and denied in part.

### I.    FACTUAL BACKGROUND[4]

Superior is a company owned and co-founded by Debra Guerin ("Guerin") that employs health care professionals to deliver at-home services to patients. Superior maintains an office on Bluebonnet Boulevard in Baton Rouge, Louisiana where its employees perform administrative work. Superior contends that it has never employed fifty (or more) employees at any particular time and note that all employees working at

---

[1] Rec. Doc. No. 25.
[2] Rec. Doc. No. 32.
[3] Rec. Doc. No. 33.
[4] The facts are drawn from Rec. Doc. Nos. 16, 17, 19, 29, & 32.
39230

Superior's Bluebonnet office are women.

Plaintiff was hired by Superior on January 9, 2014 to perform filing at the Bluebonnet office at the rate of $12/hour. Once Superior learned that Plaintiff had data entry experience, Plaintiff's job duties were expanded, and she was given a pay increase to $13/hour. Upon her initial employment, Plaintiff chose not to obtain health insurance through Superior as she remained on her parents' health plan. However, shortly thereafter, Plaintiff was ineligible to remain on her parents' plan, so she approached Guerin for a pay increase that would render her eligible for health insurance through Superior. Guerin granted this request and increased Plaintiff's pay to $15/hour so she could participate in Superior's health insurance plan.

For the entirety of Plaintiff's employment with Superior, Plaintiff was supervised by Guerin and Jennifer Rouillier ("Rouillier"), both of whom are working mothers.

Superior has written employment policies and provides to employees an Employee Code of Conduct which notes that, among other things, insubordination and personal telephone use during work hours can lead to termination. Plaintiff admits that she received and read these policies and the Employee Code of Conduct.[5] Indeed, Plaintiff acknowledged that she was aware that insubordination to her supervisors and unauthorized personal telephone use during work hours was not permitted and could be cause for discharge.[6]

Initially, Plaintiff did well at Superior, and she received a favorable performance review just weeks after her start date. Plaintiff received a second favorable performance

---

[5] Rec. Doc. No. 29-3, p. 9; Deposition of Mallory Ruh, p. 74.
[6] *Id.* at pp. 10-12; Deposition of Mallory Ruh, pp. 75-77.
39230

review three months after her employment began. Around this time, Plaintiff asked Guerin if she could be moved from the back office to a front office in the building, and Guerin granted this request. However, subsequent to this move, Plaintiff and Superior agree that Plaintiff's relationship with Guerin went "downhill."[7] Plaintiff testified that she did not like the way Guerin treated other employees and described her as "hateful."[8] Guerin believes the problems began because Plaintiff created "tension between all the employees" and talked "bad about people in the back [of the building]."[9]

Plaintiff admits that she regularly violated company policy regarding insubordination and personal telephone use by texting family, friends, and co-workers throughout the work day and that Guerin repeatedly counseled her about these violations.[10] Plaintiff further admits that the texts she sent to co-workers sometimes referred to Guerin as "the Devil" and "Lucifer."[11] While Plaintiff acknowledges her fault in violating these company violations, she contends that she should not be singled out as other employees regularly committed the same infractions.

On January 21, 2014, Plaintiff received another performance evaluation that was favorable but included a note that Plaintiff was not following Superior's rule regarding texting in the workplace. Despite this notation, Plaintiff admits that she continued to use her cellphone during work.[12]

Guerin became aware of Plaintiff's pregnancy between December 2013 and

---

[7] Rec. Doc. No. 29-4, p. 7; Deposition of Debra Guerin, p. 33; Rec. Doc. No. 29-3, p. 25; Deposition of Mallory Ruh, p. 124.
[8] Rec. Doc. No. 29-3, p. 25; Deposition of Mallory Ruh, p. 124, line 20.
[9] Rec. Doc. No. 29-4, p. 7; Deposition of Debra Guerin, p. 33, lines 4-9.
[10] Rec. Doc. No. 29-3, pp. 12-15; Deposition of Mallory Ruh, pp. 77-80.
[11] *Id.* at p. 16; Deposition of Mallory Ruh, p. 81, lines 4-6.
[12] *Id.* at p. 37; Deposition of Mallory Ruh, p. 159.

January 2014. Plaintiff testified that Guerin was "nice" to her upon learning of her pregnancy and that Guerin never said anything negative about Plaintiff's pregnancy.[13] Plaintiff further testified that Rouillier and her co-workers were also very supportive about her pregnancy. Plaintiff testified that Rouillier brought her baby gifts and told her this baby would be a positive thing in her life,[14] and she also assisted Plaintiff in determining how best to utilize her paid time off and leave time for doctor's appointments and maternity leave.[15] Plaintiff acknowledged that Superior never denied her the right to take off for a pre-natal doctor's appointment.[16] Plaintiff did, however, also testify that Guerin, Rouillier, and other co-workers did not hide their displeasure at the frequency of her doctor visits and remarked at how often she was missing work.[17]

Superior contends that, following Plaintiff's pregnancy, her telephone use violations continued, and she also began violating the policy that employees clock out to eat meals. Plaintiff acknowledged that, on one occasion, she was training an employee while eating a plate of food.[18] Superior also contends Plaintiff began to increasingly miss work following her pregnancy for unrelated, non-pregnancy reasons.[19] Further, Superior maintains that Plaintiff continued to cause turmoil in the office, telling a co-worker that the other co-workers "hated" her,[20] and Plaintiff could not recall specifically but admitted that it's possible that she told Guerin that she hated her.[21]

---

[13] *Id.* at pp. 44, 47; Deposition of Mallory Ruh, pp. 179, 186.
[14] *Id.* at p. 47; Deposition of Mallory Ruh, p. 186.
[15] *Id.* at p. 29; Deposition of Mallory Ruh, p. 131.
[16] *Id.* at p. 30; Deposition of Mallory Ruh, p. 132.
[17] *Id.*
[18] *Id.* at pp. 52-53; Deposition of Mallory Ruh, pp. 233, 239.
[19] Rec. Doc. No. 29-4, p. 15; Deposition of Debra Guerin, p. 95.
[20] Rec. Doc. No. 29-3, p. 68; Deposition of Mallory Ruh, p. 315.
[21] *Id.* at p. 55; Deposition of Mallory Ruh, p. 241.

As Plaintiff allegedly continued to commit these violations despite repeated admonitions, Superior contends Guerin began to document Plaintiff's policy violations. Between February 18, 2014 and June 6, 2014, Superior contends Guerin documented nine separate company policy violations involving insubordination, inappropriate cellphone usage, eating meals at her desk, and falling behind in job duties.[22] In particular, in the write-up dated February 20, 2014, Guerin reports that, when she admonished Plaintiff for texting on her cellphone, which was hidden under a patient chart, Plaintiff responded "F-ck you!" to Guerin as she was walking out.[23] Rouillier also attested that she overhead Plaintiff say this to Guerin.[24]

Plaintiff contends she was never shown any of these alleged write-ups, she disputes that she was ever written up during her employment with Superior, and she believes these write-ups were created after she was fired.[25] Superior contends it is not its practice to have employees sign the write-up forms and directs the Court to Plaintiff's admission that Guerin immediately addressed performance deficiencies right when they occurred, in front of others in the office, whether an employee was pregnant or not.[26]

Superior claims that, in an effort to motivate a change in Plaintiff's behavior since counseling had not worked, Guerin gave Plaintiff a positive performance evaluation in April 2014.[27] Nonetheless, Plaintiff admitted that, by April 2014, she and Guerin "did not have a good working relationship"[28] and "didn't like each other."[29]

---

[22] *See* Rec. Doc. Nos. 29-8 through 29-17.
[23] Rec. Doc. No. 29-9.
[24] Rec. Doc. No. 26-11, ¶ 7.
[25] Rec. Doc. No. 32-2, pp. 203, 362 Deposition of Mallory Ruh, pp. 203, 362.
[26] Rec. Doc. No. 29-3, p. 51; Deposition of Mallory Ruh, p. 223.
[27] Rec. Doc. No. 29-4, p. 10; Deposition of Debra Guerin, p. 47.
[28] Rec. Doc. No. 29-3, p. 42; Deposition of Mallory Ruh, p. 174.
[29] *Id.* at p. 41; Deposition of Mallory Ruh, p. 173.

An Employee Complaint Form prepared by Guerin on June 9, 2014 indicates that Plaintiff went to Guerin's office and advised that she "was too stressed out and needed to quit. She said it wasn't good for her or the baby."[30] Guerin indicates that she advised Plaintiff that was fine, and Plaintiff told Guerin that she had other job offers and would work somewhere else after the baby was born. Plaintiff also allegedly told Guerin that she hated working at Superior but needed the money.[31] Both Plaintiff and Superior agree that Guerin offered Plaintiff a part-time position;[32] however, Superior contends this was intended to aid Plaintiff, but Plaintiff believes that it was because Superior wished to stop paying her health insurance benefits and/or force her to quit. Superior counters that Plaintiff's belief is unfounded since Superior did not have to raise Plaintiff's salary in the first place to make her eligible for health insurance benefits if it wanted to avoid such an obligation. Superior also points to Plaintiff's testimony that she believed Superior wanted her to quit solely because she and Guerin were not getting along and not for any other reason.[33]

Two days after the June 9 meeting where Plaintiff allegedly told Guerin she wanted to quit, Plaintiff was in a car accident, and she stayed in the hospital overnight although she did not sustain any injuries.[34] On the evening of the accident, Plaintiff texted Rouillier that she would not be at work the next day due the accident, to which Rouillier responded by asking how Plaintiff was doing.[35] Superior contends that, considering the

---

[30] Rec. Doc. No. 29-20.
[31] *Id.*
[32] Rec. Doc. No. 29-4, p. 13; Deposition of Debra Guerin, p. 55; Rec. Doc. No. 29-3, pp. 57-58; Deposition of Mallory Ruh, pp. 245-46.
[33] Rec. Doc. No. 29-3, p. 59; Deposition of Mallory Ruh, pp. 247.
[34] *Id.* at p. 65; Deposition of Mallory Ruh, pp. 276.
[35] *Id.* at p. 66; Deposition of Mallory Ruh, pp. 282.

39230

circumstances, Guerin and Rouillier decided that it was best at that point that Plaintiff not return to work. Superior acknowledges that Rouillier sent the following text message to Plaintiff on the day of her accident:

> Due to all the recent problems we have had we feel it's best for you and the baby if we just cut ties now b/c u r too stressed working here and can cause harm to the baby. We don't want to cause you or the baby any stress or further problems. U can come by and get you ck just call me first so I know when u are coming thanks for all your hard work and good luck[.][36]

Rouillier attested that she did not realize that Plaintiff was in the hospital when she sent the above text message.[37] Rouillier also attested that: "By echoing back Ms. Ruh's own sentiments to her in the text message informing her of her termination I intended to spare her feelings and avoid making the termination personal."[38] Plaintiff testified that she believes her termination was an act of pregnancy discrimination based on the language of this text message.[39] Plaintiff also testified that she considered the following acts discriminatory: not allowing Plaintiff to eat at her desk despite severe morning sickness, criticism that Plaintiff had too frequent bathroom trips, and criticism about Plaintiff's too frequent doctor appointments.[40]

Following her termination, Plaintiff sought unemployment compensation benefits. When Superior was asked to document why Plaintiff was terminated, it noted the various company policy violations mentioned herein, but it also stated that Plaintiff was "very emotional d/t pregnancy."[41]

---

[36] Rec. Doc. No. 29-21.
[37] Rec. Doc. No. 26-11, ¶ 9.
[38] *Id.* at ¶ 10.
[39] Rec. Doc. No. 29-3, p. 49; Deposition of Mallory Ruh, p. 195.
[40] Rec. Doc. No. 32-2, pp. 196-198; Deposition of Mallory Ruh, pp. 196-198.
[41] Rec. Doc. No. 29-22.

39230

Superior maintains that it has never discriminated against pregnant employees, considering both Guerin and Rouillier are working mothers, and Rouillier was pregnant and gave birth while working for Superior. Superior contends that any pregnant employees who have been terminated have been so because of legitimate, non-discriminatory reasons and not due to pregnancy. Notably, Plaintiff admits that she never witnessed Guerin treat other pregnant employees poorly and did not believe that Guerin had a problem with anyone's pregnancy but hers.[42]

Plaintiff maintains that Superior has only now produced "a litany of disciplinary write-ups that were never shared with [Plaintiff]."[43] Moreover, Plaintiff contends the text message wherein she was fired is direct evidence of discrimination and indicates that Plaintiff's pregnancy was a motivating factor in her termination. Further, Plaintiff argues that the June 12 termination memo references her pregnancy but is conspicuously devoid of most of the reasons now being offered by Superior for her termination, *i.e.*, tardiness, cellphone use, or unsatisfactory work performance. Although Superior alleges that Plaintiff was written up ten times prior to her termination, Plaintiff maintains that she was never written up during her employment.[44]

Plaintiff contends that the best evidence of her work performance is her evaluations, which were generally satisfactory. While Plaintiff acknowledges she was not a perfect employee, she contends that the performance evaluations completed by Guerin demonstrate a positive job performance by an employee deemed worthy of raises. Importantly, Plaintiff claims that the evaluations are mostly remarkably devoid of

---

[42] Rec. Doc. No. 29-3, pp. 70-71; Deposition of Mallory Ruh, pp. 320, 322.
[43] Rec. Doc. No. 32, p. 2.
[44] Rec. Doc. No. 32-2, p. 203; Deposition of Mallory Ruh, p. 203.
39230

references to these disciplinary write-ups which should cast doubt on their veracity and timing.

Plaintiff acknowledges that the January 21, 2014 evaluation notes that she engaged in too much texting at work, and reflects that disciplinary action could occur, but states that all other categories were positive. Plaintiff's April 13, 2014 evaluation reveals a rating of "excellent" or "good" in every category, which Plaintiff argues demonstrates an improvement from the previous year. Additionally, there is no reference to cellphone use in the April 2014 evaluation, and Plaintiff contends she received two raises during this time period. Thus, Plaintiff contends her evaluations raise serious questions regarding the veracity of these never-seen write-ups. Plaintiff maintains that, if her conduct as expressed in the write-ups was so flagrant, surely the performance evaluations would have reflected the same. Further troubling, Plaintiff notes that, although the disciplinary counseling form used by Superior contains a line for the employee's signature, Guerin admits that she never presented a write-up to Plaintiff to review or sign.[45]

Plaintiff contends that, along with the termination text message, there are other examples of Guerin's conduct that Plaintiff believes constitutes pregnancy discrimination. For example, Plaintiff points to Guerin's deposition testimony that, upon learning of Plaintiff's pregnancy, she was "just like, oh, my goodness, everybody is pregnant."[46] Further, Plaintiff contends Guerin was "nervous" about staffing considering the pregnancies in the office, and she testified that Guerin "had a whiteboard with everyone that was pregnant and their due date."[47] Plaintiff also points to Superior's response to

---

[45] Rec. Doc. No. 32-6, p. 35; Deposition of Debra Guerin, p. 35.
[46] *Id.* at p. 42.
[47] Rec. Doc. No. 32-2, p. 319; Deposition of Mallory Ruh, p. 319.
39230

the EEOC regarding her claims, referring to Plaintiff as "already an underperforming employee with cellphone abuse problems" who "found herself with an unwanted pregnancy by a one-night stand, with her boyfriend in jail, financial problems, parental problems, and more."[48] Thus, Plaintiff contends the numerous genuine issues of material fact in this case preclude summary judgment in favor of Superior.

Plaintiff filed suit against Superior alleging claims of pregnancy discrimination under Title VII of the Civil Rights Act of 1964[49] and the Louisiana Employment Discrimination Law,[50] violation of the Family Medical Leave Act of 1993,[51] and intentional infliction of emotional distress under Louisiana tort law. Superior moves for summary judgment on all claims.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[52] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[53] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's

---

[48] Rec. Doc. No. 32-14, p. 3.
[49] 42 U.S.C. § 2000e, *et seq.*
[50] La. R.S. 23:301, *et seq.*
[51] 29 U.S.C. § 2601.
[52] Fed. R. Civ. P. 56(a).
[53] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
39230

case."[54] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[55] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[56]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[57] All reasonable factual inferences are drawn in favor of the nonmoving party.[58] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[59] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[60]

---

[54] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[55] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[56] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[57] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[58] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[59] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[60] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).

39230

### B. Title VII Pregnancy Discrimination

The Pregnancy Discrimination Act amended Title VII to include pregnancy discrimination within the definition of sex discrimination.[61] As such, Title VII prohibits employers from discriminating against a female employee "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work."[62]

Plaintiff contends the text message terminating her constitutes direct evidence of pregnancy discrimination as it demonstrates that her pregnancy was, at least, a motivating factor for her termination. Defendant contends that, read in context, the text message does not constitute direct evidence of discrimination, and Plaintiff is not relieved of the burden of presenting a *prima facie* case of pregnancy discrimination, which it claims she has failed to do.

The Court finds that Plaintiff's evidence is sufficient to create a genuine issue of material fact that requires trial of her claim of pregnancy discrimination. The language of the text message specifically references terminating Plaintiff as "best for [her] and the baby" and notes that Plaintiff is "too stressed working here and can cause harm to the baby."[63] Superior does not deny the statement but claims that it was made to "echo Plaintiff's own words back to her to spare her feelings."[64] To agree with such a

---

[61] *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 859 (5th Cir. 2002).
[62] 42 U.S.C. § 2000e(k).
[63] Rec. Doc. No. 29-21.
[64] Rec. Doc. No. 33, p. 3.
39230

determination, however, the Court would have to give credence to Superior's claimed intent, which is not the Court's role at the summary judgment stage. Moreover, the Court must draw factual inferences in favor of the non-moving party.

Drawing factual inferences in favor of the Plaintiff, the termination text message constitutes credible direct evidence, because, if believed, it proves Superior's discriminatory animus without inference or presumption.[65] The presence of direct evidence of Superior's discriminatory intent affects the burden of proof under Title VII and requires that Superior's motion for summary judgment be denied.

> "If the Plaintiff provides direct evidence, then the burden shifts to the employer to prove that the same adverse action would have occurred regardless of discriminatory animus."[66] If the Plaintiff provides circumstantial evidence, "the modified *McDonnell Douglas* approach" applies.
>
> Where a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* framework does not apply in determining whether a genuine issue of material fact exists.[67] Thus, "if a plaintiff is able to produce direct evidence of discrimination, [s]he may prevail without proving all the elements of a *prima facie* case." Instead, where "a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor."[68]
>
> …"Once the burden of persuasion shifts to the employer ..., the employer may escape liability only if it proves that it would have made the same employment decision based on purely legitimate reasons." "[P]roving that the same decision would have been justified ... is not the same as proving

---

[65] *Lazarou v. Miss. State Univ.*, 549 F. App'x 275, 279 (5th Cir. 2013); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n. 3 (5th Cir. 2003); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).
[66] *Terry v. Promise Hosp. of Ascension, Inc.*, No. 13–128–SDD, 2014 WL 4161581, at *5 (M.D.La. Aug. 19, 2014)(quoting *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 272 (5th Cir. 2006) (*per curiam*) (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003))).
[67] *Id.*, citing *Lazarou v. Mississippi State University*, 549 F. App'x 275, 279 (5th Cir. Dec. 17, 2013) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").
[68] *Id.* (internal citations omitted).

39230

that the same decision would have been made." Nor may an employer "meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason." "The very premise of a mixed-motives case is that a legitimate reason was present...." "The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision."[69]

The text message from Guerin is direct evidence of discrimination because the statement was "(1) related to the protected class of persons of which the Plaintiff is a member, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue."[70]

While Superior has produced evidence of its legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, Guerin's text message is direct evidence of pregnancy discrimination and shifts the burden of proof to Superior to show that its legitimate reasons, standing alone, would have induced it to make the same decision. Further, Plaintiff has also presented summary judgment evidence that, if believed, could cast doubt on the veracity and timing of the disciplinary write-ups as compared against Plaintiff's concurrent mostly favorable performance evaluations and raises. It is the task of the jury, not of the Court on summary judgment, to weigh the credibility of the parties and to believe, or disbelieve, Superior's evidence that it would have made the same decision in the absence of Plaintiff's pregnancy.[71] Accordingly, summary judgment on Plaintiff's pregnancy discrimination claim is denied.

---

[69] *Id.* (quoting *Price Waterhouse[ v. Hopkins*], 490 U.S. 228, 252 (1989), *overruled on other grounds by* the Civil Rights Act of 1991; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).
[70] *Id.* at *7 (citing *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001)).
[71] *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 416 (5th Cir. 2003), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *Terry*, 2014 WL 4161581, at *9.
39230

Summary judgment is likewise denied on Plaintiff's Louisiana Employment Discrimination Law ("LEDL") claim, which is subject to the same reasoning and analysis set forth under Title VII. The scope of the LEDL is the same as Title VII and, therefore, claims under the LEDL are analyzed under the Title VII framework and jurisprudential precedent.[72] As such, the Court's ruling on Plaintiff's Title VII claim applies with equal force to her LEDL claim.

### C. Intentional Infliction of Emotional Distress ("IIED") Claim

Plaintiff contends that, at the time of the termination text message, Superior knew of her personal problems, the difficulties in her pregnancy including gestational diabetes, and that she had just been admitted to the hospital following a car accident. Plaintiff further contends that, sending her this text message, under the circumstances, constitutes intentional infliction of emotional distress under Louisiana law as it goes beyond all possible bounds of decency and should be regarded as utterly intolerable in a civilized society.

Superior moves to dismiss Plaintiff's IIED claim, arguing that the text message does not rise to the high level of outrageous conduct required by Louisiana law and directs the Court to Rouillier's attestation that, when she sent the text message, it was "not [her] understanding that [Plaintiff] was in the hospital."[73] Rouillier further attested that the text message was intended to "spare [Plaintiff's] feelings and avoid making the termination personal."[74] Superior argues that, when read in context with the surrounding

---

[72] *La Day v. Catalyst Technology, Inc.*, 302 F.3d 474, 477 (5th Cir. 2002); *Alderman v. Great Atlantic & Pacific Tea Co., Inc.*, 332 F.Supp.2d 932, 936 (E.D.La. 2004).
[73] Rec. Doc. No. 29-10, ¶ 9.
[74] *Id.*, ¶ 10.
39230

Page 15 of 19

circumstances, the text message was not intended to inflict emotional distress upon Plaintiff but to relieve her of any stress related to her job.

To meet her summary judgment burden to establish a material fact issue regarding her intentional infliction of emotional distress claim, Plaintiff must provide evidence "'that (1) the conduct [of defendant] was extreme and outrageous; (2) the emotional distress suffered was severe; and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result.'"[75]

Plaintiff has cited no jurisprudence finding that termination of employment under similar circumstances or late in one's pregnancy could be considered extreme and outrageous conduct. In *Nicholas v. Allstate Ins. Co.*,[76] the Louisiana Supreme Court canvassed national jurisprudence and cited a case of employment termination during pregnancy as an example of conduct that was "merely tortuous [sic] or illegal [and] does not rise to the level of being extreme and outrageous."[77] This Court noted that "courts have declined to find conduct akin to Defendant's as outrageous even where the employer fired the Plaintiff just before or even the day of delivery of her child."[78] One district court applying Louisiana law has held that firing an employee five weeks before she gave birth "does not indicate that management engaged in any conduct toward plaintiff that can be

---

[75] *Iturralde v. Shaw Group, Inc.*, 512 F. App'x 430, 435 (5th Cir. 2013) (quoting *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La.1991)).
[76] 765 So.2d 1017 (La. 2000).
[77] *Id.* at 1024–25 (citing *Harvey v. Strayer College, Inc.*, 911 F.Supp. 24 (D.D.C.1996) (applying District of Columbia law) ("an employee's termination did not constitute extreme and outrageous conduct even though the pregnant employee was summoned and confronted with questioning about her ability to conduct fall registration, [with her manager] knowing that earlier pregnancies had resulted in untoward hospitalization....")).
[78] *Martin v. Winn-Dixie Louisiana, Inc.*, 132 F.Supp.3d 794, 824 (citing *Pate v. Pontchartrain Partners, LLC*, No. 13–6366, 2014 U.S. Dist. LEXIS 157743, at *7–8, 2014 WL 5810521, at *4 (E.D.La. November 7, 2014) (discussing several other district court cases involving Plaintiff's in good and below-average standing with the employer)).
39230

characterized as extreme and outrageous" for purposes of establishing a legal claim of intentional infliction of emotional distress.[79] While the Court believes that sending the termination text message under the circumstances may not have been the most sensitive method, it does not rise to the level of extreme and outrageous conduct sufficient to support an IIED claim.

Further, assuming that Superior's text message and termination of Plaintiff while she was in the hospital following a car accident could be considered extreme and outrageous, Plaintiff has produced no evidence to create a material fact issue as to the second or third prongs of the test for an intentional infliction of emotional distress claim. As to the second prong,

> [a] review of the Louisiana jurisprudence indicates that "severe emotional distress" may be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." "A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia, and shock."[80]

Plaintiff has pointed to no testimony or evidence suggesting that her mental state reached the level of serious emotional distress as set forth above. Further, Plaintiff has not alleged that she suffered any complications in her pregnancy due to her termination. She has also failed to direct the Court to evidence that she ever saw a doctor to treat any form of emotional distress. As in *Aronzon*,

> nothing in the record ... indicates that plaintiff suffered from severe

---

[79] *Barton v. G.E.C., Inc.*, No. 09–1123–JJB, 2011 WL 938153, at *5 (M.D.La. Mar. 16, 2011), *aff'd*, 467 F. App'x 285 (5th Cir. 2012); *see also Christen v. Pan Am. Life Ins. Co.*, No. 87–4427, 1988 WL 72881, at *1–2 (E.D.La. July 8, 1988) (termination of plaintiff's employment on the day she returned home after giving birth was not extreme and outrageous conduct).

[80] *Aronzon v. Sw. Airlines*, No. 03–394, 2004 WL 57079, at *6 (E.D .La. Jan. 9, 2004) (quoting *Norred v. Radisson Hotel Corp.*, 665 So.2d 753, 756 (La.App. 1st Cir.1995); *Magee v. Pittman*, 761 So.2d 731, 752 (La.App. 1st Cir. 2000)).

39230

characterized as extreme and outrageous" for purposes of establishing a legal claim of intentional infliction of emotional distress.[79] While the Court believes that sending the termination text message under the circumstances may not have been the most sensitive method, it does not rise to the level of extreme and outrageous conduct sufficient to support an IIED claim.

Further, assuming that Superior's text message and termination of Plaintiff while she was in the hospital following a car accident could be considered extreme and outrageous, Plaintiff has produced no evidence to create a material fact issue as to the second or third prongs of the test for an intentional infliction of emotional distress claim. As to the second prong,

> [a] review of the Louisiana jurisprudence indicates that "severe emotional distress" may be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." "A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia, and shock."[80]

Plaintiff has pointed to no testimony or evidence suggesting that her mental state reached the level of serious emotional distress as set forth above. Further, Plaintiff has not alleged that she suffered any complications in her pregnancy due to her termination. She has also failed to direct the Court to evidence that she ever saw a doctor to treat any form of emotional distress. As in *Aronzon*,

> nothing in the record ... indicates that plaintiff suffered from severe

---

[79] *Barton v. G.E.C., Inc.*, No. 09–1123–JJB, 2011 WL 938153, at *5 (M.D.La. Mar. 16, 2011), *aff'd*, 467 F. App'x 285 (5th Cir. 2012); *see also Christen v. Pan Am. Life Ins. Co.*, No. 87–4427, 1988 WL 72881, at *1–2 (E.D.La. July 8, 1988) (termination of plaintiff's employment on the day she returned home after giving birth was not extreme and outrageous conduct).

[80] *Aronzon v. Sw. Airlines*, No. 03–394, 2004 WL 57079, at *6 (E.D .La. Jan. 9, 2004) (quoting *Norred v. Radisson Hotel Corp.*, 665 So.2d 753, 756 (La.App. 1st Cir.1995); *Magee v. Pittman*, 761 So.2d 731, 752 (La.App. 1st Cir. 2000)).

39230

emotional distress. Indeed, plaintiff freely admitted that [s]he never saw a medical care provider while [s]he worked for [defendant], nor has [s]he seen one since [her] termination.... Although the courts do not require evidence that a plaintiff visited a doctor to sustain a cause of action for intentional infliction of emotional distress, the Court finds that plaintiff's failure to seek any type of medical treatment supports defendant's proposition that the distress was not severe.[81]

Similarly, there is no evidence in the record indicating that Superior desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from Plaintiff's termination under the circumstances. Accordingly, Superior is entitled to summary judgment in its favor as a matter of law on Plaintiff's state law intentional infliction of emotional distress claim.

### D. Family Medical Leave Act ("FMLA") Retaliation Claim

Plaintiff alleged a claim under the FMLA for retaliation. Defendant moved for summary judgment on this claim arguing that it is not subject to the FMLA as it has never employed the requisite fifty employees. Plaintiff failed to address this claim in her *Opposition* and has, therefore, failed to present a material issue of fact in dispute regarding this claim.[82] Accordingly, summary judgment in favor of the Defendant is GRANTED on Plaintiff's FMLA claim.

---

[81] *Aronzon*, 2004 WL 57079, at *6.
[82] *See Ledet v. Fleetwood Enterprises, Inc.*, 245 F.3d 791 (5th Cir. 2000)(Plaintiff's "complete failure to raise any legal or factual issue regarding that claim in his Opposition constitutes a waiver of the issue.")(citing *e.g., Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir.1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived. 'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.' " (quoting *Vaughner v. Pulito*, 804 F.2d 873, 877 n. 2 (5th Cir.1986))); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 (5th Cir.1992) ("[T]his court ... will not consider evidence or arguments that were not presented to the district court for its consideration in ruling on the motion.")).
39230

### III. CONCLUSION

For the reasons set forth above, Defendant's *Motion for Summary Judgment*[83] is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on June 22, 2017.

                                                **JUDGE SHELLY D. DICK**
                                                **UNITED STATES DISTRICT COURT**
                                                **MIDDLE DISTRICT OF LOUISIANA**

---

[83] Rec. Doc. No. 25.

39230